Next case on today's docket is the case of Dent v. Menard. And we have Mr. Kent Heller representing an appellant. And we have Mr. Kuster representing an appellant. And you may proceed, Mr. Heller, when you're prepared to. Thank you, Your Honor. May it please the Court and Counsel. If the Supreme Court's decision limiting or restricting the same-body part rule means anything, then the plaintiff in this case is entitled to a new trial. The thing that comes to mind when you look at what happened in this trial is the line from the movie Rules. We don't need no stinking rules. If you were to put the transcript that the defendant testimony offered on the wall and threw darts at it, I suspect that four out of five darts would hit parts of the testimony dealing with her prior medical conditions. This whole case was about her medical conditions. There were hours and hours of testimony about things like back pain that she had when she was pregnant 15 years earlier. What, in goodness sake, does that have to do with a shoulder injury of Menard? The case is about a lady that goes into Menard's and looks at a dishwasher. And it tips forward off the shelf, or she thinks it's going to tip forward off the shelf, and she reaches up to catch it. Now, there isn't any question that the dishwasher wasn't bolted down because after it tips, one of the employees goes over and puts the bolts back in to hold it on the shelf. That really wasn't an issue. The whole case is all this medical testimony about her pregnancy, about things that happened 10 years earlier, about all kinds of stuff that is absolutely in no way related to this incident. Parts of the body aren't even the same. If I were to ask you, do you have a cavity? And you say, no. Yes, I do. I have a cavity. And then I call your dentist and he says, well, actually, he has six cavities. And therefore, on the guise of impeachment, I can now offer all of the medical testimony about any health care that you've ever had on the grounds that it's impeaching. It has nothing to do with the case. Impeachment has to be on a material element of the case. And whether or not she had back pain when she was pregnant or she had a sprained ankle 10 years earlier, it doesn't have anything to do with an alleged shoulder injury that occurred at the store. And the interesting thing is, and here's what is really interesting, and this was an issue before the court, there is not one word, not one doctor, not one witness, lay or otherwise, that said what the Supreme Court said you have to say, that somehow those injuries are related to the current complaint. No one said that. They produced absolutely no evidence that that was in any way related to the issue that was before the court. On that ground alone, the plaintiff should be entitled to a trial without all this clutter, without painting the picture, well, this lady's got lots of problems, so she shouldn't get anything in this case. She's had pain for a long time, so in this case, she shouldn't be able to recover. And the other issue that the court should consider is the testimony of the defendant's alleged expert. He testifies at his evidence deposition that in every case, without limitation, in every case, a person who has a soft tissue injury heals within six weeks, and if you don't heal in six weeks, you're faking from the get-go. You don't have any injury, and therefore, Ms. Dent didn't have any injury. And I filed a motion to bar that testimony on the grounds that it's junk science. It's not consistent with mainstream medical literature. Most injuries heal within six to 12 weeks, but not all. The medical literature, the depositions, the other doctors would say that somewhere between 5 and 25 percent of the time, people don't heal. It'd be nice if we all did. There'd never be any soft tissue injury cases. You could draw a line, you get six weeks of care, cut it off, and as a matter of law, that's all you get. And at the argument on the motion to bar, Mr. Custer said, well, Judge, if Mr. Heller had made that objection at the time of the deposition, I could have asked a few more questions and that would have cleared it up. And so the judge says, okay, go back and resume the deposition, and oh, by the way, Mr. Heller, you pay for it. So we do. And at the deposition, the subsequent deposition, the doc says, yeah, it's not really all, it's really most. But I still think she's faking. And then we go to trial, and the trial judge doesn't bar the testimony of it's everybody. But further to that, he won't allow us to let the jury hear the second half of the deposition that was supposed to clear this up, where the doctor said, well, I didn't mean all, I meant most. How important can that be? I mean, what's the point of going back and taking the further deposition if you can't say either, one, it is junk science and it shouldn't have come in in the first place, or two, at least allow the jury to see the whole opinion so that, you know, even this guy doesn't really mean it's everybody. It really is, as medical literature and as the science that we know, it's most. And that you can't say at six weeks you draw the line. If you're still hurting after six weeks, you're a faker. We believe the court erred in either allowing that testimony or in the alternative, not allowing the jury to hear the whole picture, which would have been simple to do, simply by allowing us to read, as we asked to do, the supplemental deposition that the court ordered us to take. For those reasons, we're asking that the court reverse the circuit court and grant a new trial. You sought damages for a new injury, not an aggravation of a preexisting. Is that correct? That's correct. But the jury did hear evidence of a preexisting injury because you opened that door. Would that be correct or not correct? I don't think that we opened the door, but even if that were the case, even if, what's all the rest of the medical, the back pain, the pregnancy, what's all that got to do with it? There wasn't any evidence that that was aggravated. The child had been delivered 15 years earlier. How do you get past some rejection? How do you get past a jury ruling? I'm sorry? It was a jury ruling. It was. Right. But they shouldn't have heard that evidence. They shouldn't have had, the picture was this girl has complained of pain on all different kinds of body parts. She, therefore, must just be a complainer and you shouldn't give her anything. And that is what the argument was. That's the only reason. And the Supreme Court says we can't do that. So if we can't do it, we can't do it. If we can, then we change the law. Thank you. Thank you, Mr. Heller. We'll take the opportunity. Mr. Kessler? Thank you. Following up on that, that last question, the pain courtyard request that he opened the door, what did he open the door on? Your Honor, in the, he opened up the door on the lack of pain that she talked about having after this accident, as a result of the accident. One thing that I want to make very clear is, this plaintiff did not walk into court and simply say, I have a shoulder problem and, therefore, I want damages for my shoulder. It was much more than that. In fact, it was the skull that she said was related, neck she said was related, left shoulder, right shoulder, left arm, right arm, left wrist, both hands, and tingling and numbing in her left fourth and fifth digits, and low back. She basically covered everything. The first witness that Mr. Heller called was his client. And he got into and asked her, did you have any problems with pain in your arms before the accident? And she said no. Clearly opened the door, and we are talking about the same problems and pain she was talking about in this particular case, and asking this jury for. So, we weren't going all over the place at all. In fact, I think it's important to note, when I read the appellant's brief, and he talked about all we wanted to talk about was the pregnancy, I wasn't certain we were actually talking about the same case. It was Mr. Heller and his questions with the plaintiff and during the evidence depositions of the treating physicians that talked about pregnancy. In fact, he brought it up being the plaintiff, Mr. Heller and counsel, at 85, page 86 of the record, 101, 177, and 178. I didn't ask questions about pregnancy. Now, going back to the Supreme Court case of Boykin, I brought that up to the judge and said, here's our guide. 2000, the Supreme Court issued its opinion in Boykin. And then in 2003 and 2004, the Felber and the Janke cases also talked about Boykin. I agree. The Boykin case says evidence of prior medical injury has to be relevant. It really threw out the same part of the body rule that we had exercised, that we had previously, and explained it, really throw it out. It says, really, it's more of a relevancy rule. The same part of the body was more of a bright-line test. And it said, certainly, evidence of prior injury or medical condition will be introduced if, for example, it can negate causation, if it can negate or reduce damages, if it can impeach the plaintiff, or if the plaintiff's opened the door. Justices, we only need one. The trial court in this case had all four. And there was, indeed, expert testimony which related them. Let me talk of just about two of them right now. There were more. But Dr. Leventhal, an orthopedic surgeon in Effingham, Illinois, we had the luxury and the benefit. When I say we, I'm talking about everyone in this case. He treated this plaintiff before and after this accident. He treated her four days after the alleged incident and 13 days after the alleged incident. He ordered an MRI and reviewed an MRI. Dr. Leventhal, their orthopedic treating physician, their witness, testified that I looked at everything. I saw what happened to her before. She had a herniated disc in 01. She had degenerative disc disease. I looked at the MRI. There is nothing that happened at Menards on October 22, 2005, that caused an injury. There is nothing that happened on October 22, 2005, that aggravated and or exacerbated an injury. These matters related to her prior problems. Very compelling, their witness. But even more than that, prior to Mr. Heller's involvement in this case, under Supreme Court Rule 215, the defendant and the plaintiff agreed that a 215D impartial medical examination would aid the court to determine what is happening with this plaintiff's medical issues. The plaintiff agreed it would be necessary. The plaintiff agreed it would aid the court. The plaintiff agreed that Dr. Richard Lehman, an orthopedic surgeon in St. Louis, Missouri, should conduct it. Only after Dr. Lehman issued his report did they start complaining about whether they liked the report or not. Dr. Lehman examined the plaintiff. He looked at all of the medical records. He read the plaintiff's deposition. And basically the parties were saying, Dr. Lehman, tell us where these pains and complaints are coming from. And he told us. He said, it has nothing whatsoever to do with the alleged incident at Menards. It has everything to do with her prior complaints. And keep in mind, I cited the record quite often. Can't that be an aggravation of a preexisting injury? We see that all the time. Oftentimes you'll see an aggravation of a preexisting injury. But I point blank asked Dr. Lehman, Doctor, do you have an opinion within a reasonable degree of medical certainty were there anything that happened on the Menards store on October 22, 2005, aggravated and or exacerbated the injury? The same question I asked Drs. Leventhal and Shuler. He said, no. I don't know how you can have more compelling evidence, more relevant evidence, than to be able to talk to and have the plaintiff's own treating physicians who treated the plaintiff before and after and also having an impartial medical examiner saying, I've looked at all of these things. She had prior problems and this thing that happened at Menards had nothing whatsoever to do with her pain and complaints. Impeachment. Again, I've already mentioned that the plaintiff testified right out of the chute that she didn't have any arm pain, back pain, shoulder pain before this accident. So, of course, I'm allowed to ask her, well, wait a minute. Isn't it true that on May 14, 2005, a mere five months prior to this alleged incident, that you went to the emergency room? You were in such pain, you had to go to the St. Anthony emergency room. And why? I was there having neck pain, 7 on a 10 scale. I had arm pain, both arms, 8 on a 10 scale. And this is after she just told the jury that she didn't have these pain and problems at all before this accident. This is a mere five months. So, of course, it goes to impeachment. Of course, it goes to negate causation. And of course, it goes to negate and or reduce damages. And I think, if I may, may I put up this diagram? Certainly, Mr. Miller. Just the photos. I've seen the picture. I don't know if you can see. I'll just hold it up here for now. This is the dishwasher. This is indeed the dishwasher. These photos were taken on the day of the accident. And just to dispel any notions that this dishwasher fell out at some point, the evidence was clear that because of the display, the way the wooden case surrounded it, there's no way it could have fallen out or tilted out any further than it did. So when we initially had this case, they talked about it falling on me. Well, I think the evidence was quite clear that it did not. So are you saying was there a contention that it fell to the floor? When the complaint was initially filed, and if you look at the medical records concerning the history provided by the plaintiff to the doctors, you will see, she says, a dishwasher fell on me. Now, it didn't say it fell on the floor, but it didn't say a dishwasher tilted out about 20 degrees and I thought it was going to fall and I lifted it back up. So I think I just wanted the court to be clear what did or did not happen. Would the trial court articulate her basis for denying the Fry hearing? Absolutely. Tell me. Certainly. On the eve of trial, the day before, plaintiff's counsel made an oral motion for a Fry hearing. Well, and I stood up and said, Your Honor, Illinois courts are pretty clear, Illinois law is pretty clear. You don't get a Fry hearing unless and until You can convince the court that something the doctor or the expert is saying is new or novel. Is this a Fry hearing on the 215 expert? Correct. The one that they agreed to. The one that they said, yes, we need this. Absolutely. When you say they agreed to it, the court can appoint an impartial without an agreement. Absolutely. The court can do it. But you're saying that there wasn't an hearing, this was agreed to. Exactly. The plaintiff agreed to it, the defendant agreed to it, we agreed to everything. And they agreed to the doctor. Absolutely. And an agreed order was actually entered by the court prior to the trial. So I don't know how you can have more justification under Boykin to introducing the medical. You can go back to answering the Fry question I interrupted. Oh, yes, thank you. Thank you, I'm sorry. So I said, Judge, there has been, here we are the day before trial, there has been absolutely no showing that what Dr. Layman did or didn't do was new or novel. Keep in mind, Dr. Layman, very credited. He gained position for NFL, NHL, hockey teams, Nike International, track teams, UCLA, taught medical school at the University of Washington U. But I said, Your Honor, he didn't rely on any junk science. In fact, here's the discovery depth, here's the evidence depth, and here's the supplemental deposition. Read it, please. She goes back in her chambers, and she reads those things. And she comes out and says, I agree with the defense. There is absolutely nothing in here that would suggest anything was new or novel. In fact, if you really want to get into it, if you go back and look at the evidence deposition that I took, I didn't say a word about whether or not all soft tissue injuries heal within six weeks. That came out of the blue from plaintiff's counsel. And if you want to go look at those depositions, you'll see Dr. Layman says, That's not why I issued my reports. I have a lot of experience. I do a lot of exams. I review the medical records. I reviewed everything in this case. My opinion, the opinion that the plaintiff ended up not liking, was based upon my examination and my tests. It had nothing whatsoever to do with some notion that soft tissue injuries heal. And if you have any doubt about that, I would urge you, that's what the evidence depth, and that's what the supplemental depth says. Also, with regard to impeachment, Dr. Prather and Dr. Gallitz were only the two of the five physicians who saw the plaintiff who would actually say that something is related here to the Menards incident. Well, as it turns out, and this is precisely out of Boykin, the plaintiff basically told Dr. Gallitz and Dr. Prather, I didn't have any of these problems before the accident. I didn't have any symptoms before this incident. And all of the problems are related to this alleged October 2205 incident. Boykin absolutely says, in fact, it specifically says in the case, you can introduce what happened before to show the court and or the jury what the plaintiff told the treating physicians concerning this. And I actually put a lot of the testimony in my brief. Dr. Gallitz, for example, said, I asked her if she had any problems, and she said no. I have to assume she's telling the truth. Now, I don't know why the plaintiff didn't tell her this, the doctors this, but I don't know why the plaintiff didn't tell her doctors the whole story, or that five months before this incident she went to the emergency room complaining of pain in her neck, shoulders, arms, and having pain on an 8 to 10 scale and taking Vicodin. But the doctors did say yes. I assume that she didn't have any problems because I asked her, and she said no. So, again, that's just another way to explain what the other doctors are saying. So, again, we had Dr. Leventhal, Dr. Shula, the chiropractor, who also treated the plaintiff before and after, who said, no, I don't think anything happened as a result of the October 2205 Menard incident. I was treating her back, shoulders, arms beforehand from 1994 to 2004, the same parts of the body, the same things I treated after the accident, and no, I don't believe it's related. From her own treating physicians, and I think maybe plaintiff's counsel misspoke when he called Dr. Lehman the defendant's expert. No. We both agreed to Dr. Lehman, and he was an impartial medical examiner under Section 215 of the Supreme Court. Can you comment on why the supplemental deposition was not read to the jury or was not given to the jury? Yes, I can. First of all, I don't recall plaintiff's counsel asking that the supplemental deposition be read to the jury. It may have happened. I don't recall that. But what I do recall is prior to the deposition, I wasn't going to take another evidence deposition. Mr. Heller could have and had every right to have that deposition be his evidence deposition. He chose not to for whatever reason. But in my opinion, what Judge Cody said about perhaps resolving the issue was just to identify the basis of Dr. Lehman's opinion as opposed to eliciting new opinions. So that's my understanding, Your Honor. You said Judge Cody. Judge Cody. Judge Custer was our trial judge. Judge Cody was the judge on a prior pretrial motion who addressed some of these issues and said, okay, why don't we go ahead and if you can go examine what Dr. Lehman did or didn't do in another supplemental deposition. Was the supplemental deposition an evidence deposition? It was not. It was a discovery. It was listed as a discovery? That's correct. Yes. And again. I thought they said it was an evidence deposition. I said that if Mr. Heller, I presume if he wanted to notice it up for an evidence deposition, he could have. And I think maybe it was initially noticed as an evidence deposition. I already had the evidence deposition taken. I had no reason to take a supplemental evidence deposition to dispel their suggestion that it was junk science. If Mr. Heller wanted to do that, he certainly could have done that. But again, once you read the supplemental deposition, you will see that it was not a factor. There is no junk science. There was nothing whatsoever new or novel about anything Dr. Lehman did or did not do. And I've heard the red herring word once today. This indeed is a red herring. The jury had multiple reasons to find that there should be no damages. I haven't really talked about the facts, but in the couple minutes I have remaining, I think it's important to note that after this dishwasher tilted forward and purportedly caused this whole laundry list of injuries, the plaintiff didn't run out to the hospital. What did she do? She went to the cabinet design area and spoke with a gentleman by the name of Mr. Jody Kniser and said, I just wanted you to know that you have a couple of screws missing from your cabinet case on the dishwasher aisle. And Mr. Kniser testified in court and said, okay, we will check on that. Are you okay? And she said, I'm fine. After that, the plaintiff doesn't go to the hospital. What did she do? She went back to the dishwasher aisle and she admitted, and there was another employee who was there, she started checking all of the other dishwashers to see if they were screwed in. Because keep in mind, you wouldn't know whether the screws were missing or not unless you actually had the door open. So she was opening doors in the aisle, and we had a Menard employee testify about that. In fact, the Menard employee said, did you ask her how she was doing? Yes, she said she was fine. Did she do anything or say anything or walk in any way or push her cart in any way that would indicate that she was somehow injured in any of the parts of the body? She did go to the emergency room later the same day. She absolutely finally did later that day after going to the cabinet design area, going back to the dishwasher aisle, going to the front desk and spending 10 or 15 minutes talking to them, which was caught on surveillance, after walking, picking her kid up out of the cart, taking her purse, carrying her child in her right arm to the car, putting him in the car, went to her grandmother's house, and later in the day went to the emergency room and left. So yes. And I thought it was a very poignant moment in the trial. There was actually surveillance of the plaintiff while she was at the front desk. Shut the lights off in the courtroom, and we watched it. And I can tell you that there was nothing at all on that surveillance which would indicate that she was at all injured. Thank you very much. Thank you. In reverse order, Judge Cody's ruling was in regard to the evidence deposition. His words were, we can solve this. Let's reopen the deposition. And the deposition that we were supplementing was an evidence deposition. There is no reason why I couldn't take and ask questions at an evidence deposition. There's no reason that that supplemental deposition should not have been read at the time of trial. And it certainly would have been fair. Counsel suggests – Did you move it into evidence? I did. And then they objected and the judge did not allow it? That's correct. I renewed my motion to bar the evidence deposition and said, if you are going to allow it, then you need to allow the supplemental deposition. And the judge said, no, I'm not going to do that. Any reason for that? I'm not aware – What was the logic behind not allowing the balance of it in? Or what was their objection? They didn't want the jury to hear the revision of his opinion. That was the objection? Yeah, sure. That's the only reason not to let it in is because he admits that he's original. And counsel says, well, I'm the one that asked him. He comes up with this opinion. There's no injury. So I asked him, doctor, why do you think there's no injury? Because all soft tissue injuries heal in six weeks. That was the basis of his opinion. And that is junk science. And he admitted it in the supplemental deposition, but the jury never got to hear that. Now, counsel says to you, none of these previous injuries were aggravated, that Leventhal and the other doctors say it wasn't an aggravation of a preexisting injury. Then what's the point of putting in the preexisting injuries simply to prejudice the jury? Counsel can argue his view of the case, that she wasn't injured, but she's still entitled to a fair trial. And the point of Boykin was that you don't get a fair trial if the defendant parades all this past injury in front of you. If counsel's version of that case is right, then in every case where a plaintiff has a prior injury, that injury comes in. And the case means absolutely nothing because the defendant says, well, have you ever had a prior injury? If the plaintiff says no, or I wasn't having symptoms immediately before, then under their theory, all this stuff comes in because it's impeaching. And if they say yes, then they've opened the door because they admitted to a prior injury. That cannot be what our Supreme Court meant when they restricted as opposed to expanded the rule. We can't get around it that easily because if you do, then that case means nothing. And that's exactly the manner in which they've treated it here. Counsel suggests that it reduces damages, but the law is clear. The aggravation of a preexisting injury does not reduce damages. And in the IPI instructions, the jury's told that. It isn't impeaching because it's not material. I mean, if any of the doctors had said, and none of them did, not even the ones that he referred to, not even Dr. Layman, if any of them had said, I think that there's a relationship between the problems that she's having now and these prior injuries, I wouldn't make this argument, but they didn't. Dr. Layman said there was no injury whatsoever. It's not an aggravation. We believe that the interpretation that Mr. Custer urges this court to take and urges the trial court to take obliterates the Boykin rule, and the plaintiff is entitled to a fair trial with all that garbage being paraded in front of them. Thank you. Thank you, Mr. Heller. Thank you, Mr. Custer. I'll take no more of your questions.